*CJP Supp. 334 Opinion
PICHON, Chairperson.
This disciplinary matter concerns Judge D. Ronald Hyde, a judge of the Alameda County Superior Court. The notice of formal proceedings charged Judge Hyde with seven incidents of unethical conduct.
The Commission on Judicial Performance agrees with the special masters that the seven charges are supported by clear and convincing evidence and that Judge Hyde committed two acts of willful misconduct, four acts of conduct prejudicial to the administration of justice that bring the judicial office into disrepute, and one act of improper action. In determining the appropriate discipline the commission also must consider Judge Hyde’s five prior disciplines, the close relationship between his current misconduct and the prior misconduct for which he was disciplined, Judge Hyde’s lack of candor in his filings with the commission, and concerns about his credibility. For the reasons more fully set forth in this decision, the commission hereby removes Judge D. Ronald Hyde from the bench.
PROCEDURAL HISTORY
Judge Hyde was appointed to the Livermore-Pleasanton-Dublin Municipal Court in 1982 and elevated to the Alameda County Superior Court on July 31, 1998, as a result of the consolidation of the courts.
On October 23, 2001, the commission sent a preliminary investigation letter to Judge Hyde. Following Judge Hyde’s response, a further investigation letter was sent to Judge Hyde on December 18, 2001, and Judge Hyde filed a response.
A notice of formal proceedings was filed on June 17, 2002, and Judge Hyde filed his verified answer on July 31, 2002. Meanwhile, on July 12, 2002, a supplemental preliminary investigation letter was sent to Judge Hyde. Judge Hyde’s response to the letter was received on August 14, 2002. On October 17, 2002, a first amended notice of formal proceedings was filed, and Judge Hyde filed his verified answer to the first amended notice on November 4, 2002.
*CJP Supp. 335 On August 2, 2002, the Supreme Court, in response to the commission’s request, appointed three special masters. An evidentiary hearing was held from March 24 through March 27, 2003, in San Francisco, California, before the special masters: Judge Joseph F. Biafore of the Superior Court of Santa Clara County, presiding; Judge Bradley L. Boeckman of the Superior Court of Shasta County; and Judge Talmadge R. Jones of the Superior Court of Sacramento County. Mr. Jack Coyle and Mr. Andrew Blum of the commission’s office of trial counsel presented the case in support of the charges. Judge Hyde was represented by Mr. James A. Murphy and Mr. Harlan B. Watkins of Murphy, Pearson, Bradley & Feeney of San Francisco, California. On June 13, 2003, the masters submitted their 54-page report to the commission.
Following the receipt of objections and briefs from Judge Hyde and the office of trial counsel, the matter was heard by the commission on August 27, 2003. Mr. Coyle presented argument on behalf of trial counsel. Judge Hyde was represented by Mr. Murphy and Mr. Watkins. Judge Hyde presented argument on his own behalf and answered questions from commission members.
REQUESTS TO TAKE ADDITIONAL EVIDENCE
Two weeks before argument, Judge Hyde’s counsel submitted a letter requesting a continuance to allow further evidence to be taken. The letter alleged that “it would have been prejudicial to respondent to present the evidence during the Rule 123 hearing before the special masters.” On August 18, 2003, trial counsel submitted a letter opposing the request. On August 19, 2003, the commission denied the letter request for a continuance.[1]
In the days immediately preceding the hearing, Judge Hyde requested that the commission consider four additional letters from attorneys and a judge in support of Judge Hyde. At the hearing, Judge Hyde requested that the commission take additional evidence, and he proffered a package of materials which were described as his resume, the results of a survey form filled out by attorneys and court staff concerning Judge Hyde’s performance over the last several months, and additional letters in support of Judge Hyde. The commission took the requests under submission.
The commission now denies the request to consider the four letters and the request to take additional evidence. The commission’s rules contemplate that *CJP Supp. 336 all evidence, including mitigation evidence, be presented at the evidentiary hearing before the masters.[2] Nonetheless, rule 133 provides that the commission may order the taking of additional evidence.
Judge Hyde has failed to present good cause for the commission to reopen the record. The letters in support of Judge Hyde could have been, and should have been, obtained prior to the evidentiary hearing before the masters and offered into the record at that time. Absent exceptional circumstances (and none has been alleged), evidence of a judge’s performance subsequent to the masters’ hearing and report is not appropriate for inclusion in the record. There must always be some passage of time between the filing of the masters’ report and the judge’s appearance before the commission. If evidence of the judge’s performance during this period of time was routinely admitted, the record could never be closed. Furthermore, Judge Hyde had not shown the materials proffered at the hearing to trial counsel. Finally, it should be noted that due process concerns would arise were the commission to consider in a formal proceeding a new complaint against the judge (that had not been included in an amended notice of formal proceedings and proved by evidence submitted at a public evidentiary hearing).
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Count One
1. Findings of Fact
One workday morning before September 2001, Judge Hyde walked into the traffic clerk’s area of the courthouse, approached clerk Denise Silva, told her that a driver had “cut him off” on the way to work, gave her a vehicle license plate number, and asked her to obtain the Department of Motor Vehicles (DMV) records for the driver. Ms. Silva used her computer to obtain the DMV information and gave it to Judge Hyde.
There' was no case pending before the Pleasanton court to which these DMV records related. The records accessed are part of the California Law Enforcement Telecommunications System (CLETS) which is not available to the general public. The court clerks are trained regarding the confidentiality of DMV records, including the basic restriction that the records may be accessed only for court business. The clerks are required to sign acknowledgements that violations of confidentiality may result in dismissal from employment and criminal or civil action.
*CJP Supp. 337 Judges are generally aware that access to DMV records is restricted to court business. Judge Hyde was specifically on notice because in 1996 he was publicly censured for, among other things, having court personnel access DMV records for matters “not related to court business.” Judge Hyde was also on notice that clerks were required to sign acknowledgements of the confidentiality of DMV records.
After reviewing the DMV records, Judge Hyde telephoned the Pleasanton police to report the driver to a police officer. The judge either identified himself as a judge or the officer recognized him as a judge. In any event, the judge did not indicate that he was calling as a private citizen. Judge Hyde told the officer he had checked the driver’s record and did not want a complaint filed, but wanted the police to “issue a cautionary warning.” Judge Hyde’s decision to request a cautionary warning was based on his review of the DMV record, which showed that the driver had a “pretty good record.” Judge Hyde testified that, if the DMV record had revealed that the driver had a bad record, he would have filed a complaint.
Judge Hyde asserted that his actions were motivated by a concern for public safety. The masters, however, found, and the commission agrees, that Judge Hyde’s primary motivation was anger at the driver. During his testimony before the masters, Judge Hyde stated that he told Ms. Silva “some idiot cut me off.” The masters noted that Judge Hyde did not call the police while the driver was still on the road, purportedly endangering others, even though he had a cell phone in the car. Instead, he stopped for coffee and drove on to the courthouse. He then went to his chambers and approached Ms. Silva while on his way to his courtroom.
2. Conclusions of Law
The masters concluded, and the commission agrees, that Judge Hyde’s use of his judicial position to obtain confidential information from restricted DMV records that pertained to a matter of personal interest to him, not to business before the court, constitutes willful misconduct.[3]
 Judge Hyde’s conduct violated California Code of Judicial Ethics (further references to a canon are to this code) canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge shall avoid impropriety and the appearance of impropriety), 2B(2) (a judge shall not lend the prestige of judicial office to advance the personal interests of the judge), *CJP Supp. 338 and 3B(11) (a judge shall not disclose or use, for any purpose unrelated to judicial duties, nonpublic information acquired in a judicial capacity).[4]
Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity.[5] A judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.[6]
The masters concluded, and the commission agrees, that Judge Hyde acted in bad faith as his purpose in accessing DMV records was personal and not the faithful discharge of judicial duties. The masters properly rejected Judge Hyde’s claim that he could review the DMV records because of his concern for public safety.[7]
The commission also agrees with the masters’ conclusion that the bad faith element of willful misconduct was independently satisfied because Judge Hyde knew that he was acting beyond his lawful judicial power when he accessed the restricted DMV records. Judge Hyde was publicly censured in 1996 for conduct that included asking court employees to access DMV records “for the purpose of obtaining information regarding motorists that was not related to court business.” In negotiating the censure, Judge Hyde signed a statement that he was “aware of the inappropriateness” of his actions and he represented that he had “taken steps to ensure that neither court personnel nor county equipment is utilized in any manner or any activity that is not strictly court related.”
*CJP Supp. 339 When Judge Hyde asked Ms. Silva to access the DMV records, he was “acting in his judicial capacity.”[8] Judge Hyde did not give Ms. Silva advice, but made a request as a judge to a clerk to perform a task that was a normal duty for a clerk. Ms. Silva could not reasonably have been expected to refuse. In his testimony before the masters, Judge Hyde conceded that he was acting as a judge when he asked Ms. Silva to access the DMV records.
Judge Hyde’s contention that the commission is collaterally estopped from finding that he acted in his judicial capacity is without merit. The first requirement of the doctrine of collateral estoppel is that “the issue necessarily decided in the previous suit is identical to the issue sought to be relitigated . . . ,”[9] One of the findings in Judge Hyde’s May 10, 1996 public censure is that between “1991 and 1995, Judge Hyde asked various court employees to access DMV records for the purpose of obtaining information regarding motorists that was not related to court business.” The public censure notes that the “stipulated facts establish repeated instances of conduct prejudicial to the administration of justice,” and in a footnote states: “The use of DMV records for personal purposes comes very close to willful misconduct in office. The stipulated facts do not afford, however, clear and convincing evidence that Judge Hyde’s actions were performed in a judicial capacity. Dodds v. Commission on Judicial Performance[, supra,] 12 Cal.4th 163.” The commission’s finding of repeated instances of prejudicial conduct did not require a determination of whether Judge Hyde had acted in his judicial capacity because actions by a judge not committed in a judicial capacity may constitute prejudicial conduct.[10] The commission’s footnote, rather than adjudicating a necessary basis for the commission’s action, was a warning— not heeded by Judge Hyde—that accessing DMV materials for personal purposes might well constitute willful misconduct. In sum, the commission is not estopped from concluding that Judge Hyde acted in a judicial capacity when he directed Ms. Silva to access DMV records.
*CJP Supp. 340 B. Count Two
1. Findings of Fact
On November 1, 2000, Arthur Sims, the new Alameda County Court Executive Officer, made an initial visit to the Pleasanton courthouse. He was given a tour of the facilities by two members of the clerk’s office, Michelle Sunseri and Sue Stewart. Following the tour, Mr. Sims was taken by them to a break room in the civil clerk’s area to meet court staff.
Judge Hyde, who had been on the bench when Mr. Sims stopped by his department, came to the break room to meet Mr. Sims, whom he had not met before. Judge Hyde started telling anecdotes and stories about the history of the court, which had been located in Livermore until the late 1980’s. Staff members[11] were entering and leaving the room and Ms. Stewart was seated within a few feet of Mr. Sims.
One of the stories Judge Hyde related to Mr. Sims and Ms. Stewart was about two people in a car engaged in oral sex in the courthouse parking lot, one of whom was a former court employee. Judge Hyde did not have an intimate conversation with Mr. Sims, but spoke in a manner that could be heard by the employees who were in the break room. Mr. Sims and Ms. Stewart heard Judge Hyde tell this story and use the term “blow job.” Ms. Stewart was “completely embarrassed” that the judge related this story and used this language in the presence of the new court executive officer. Mr. Sims testified that he found Judge Hyde’s statement “kind of strange, kind of weird.” The masters found, and the commission agrees, that Judge Hyde’s purpose in telling anecdotes and stories about the old courthouse was to be entertaining.
2. Conclusions of Law
Judge Hyde’s conduct constitutes “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Cal. Const., art. VI, § 18, subd. (d).) Prejudicial misconduct does not require actual notoriety, but only that the conduct, if known to an objective observer, would appear to be prejudicial to public esteem for the judicial office.[12] The judge’s intent or motivation is not a significant factor in assessing whether prejudicial misconduct has occurred.[13] Prejudicial misconduct includes “ “conduct which a judge undertakes in good faith but which nevertheless would appear *CJP Supp. 341 to an objective observer to be not only unjudicial conduct but conduct prejudicial to the public esteem for the judicial office ....”’ ”[14]
Under the circumstances, Judge Hyde, by telling a sexual story using the particular language, violated canons 1, 2A, and 3B(4).[15] The commission agrees with the masters that: “It is irrelevant whether or not the anecdote or story was tme, as the judge asserts; its veracity is not at issue. And the judge’s contention that he was merely repeating a story that had been told to him using the term ‘blow job’ is not a defense; repetition of such an offensive, sexual story in these circumstances demeans the judiciary.”
C. Count Three
1. Findings of Fact
In December 1999, the judge’s daughter, Suzanne Hyde, was involved in a minor car accident in a Pleasanton shopping mall. Ms. Hyde decided to sue the other driver in small claims court in Pleasanton. On December 21, 2000, Judge Hyde brought the paperwork for his daughter’s small claims case to the clerk’s area to be filed. He gave the paperwork to a clerk and asked for the case to be set for night court. The case was set for the night of January 23, 2001.
Small claims cases were heard in the Pleasanton court during the day and on one evening per month. Judges were assigned to the night calendars, and the daytime small claims matters were usually heard by attorneys sitting as pro tempore (pro tern) judges. The judges sometimes switched their night court calendars with each other, and pro terns were occasionally used.
When the January 23 hearing date was set for Ms. Hyde’s case, the judges’ assignments to the night court calendars had not been made. On January 3, 2001, the administrator sent a memorandum to the judges and clerical staff setting forth the judges’ night court assignments for 2001. On this schedule, Judge Hyde was assigned to hear night court on January 23.
On January 8, 2001, clerk Maria Mateo, having noticed that Judge Hyde was scheduled to preside over the January 23 evening small claims calendar, *CJP Supp. 342 called Ms. Hyde and left a message that her court date would need to be rescheduled. The next day, Judge Hyde approached Ms. Mateo and told her to keep Ms. Hyde’s case on the January 23 calendar.[16]
Around midaftemoon on January 23, 2001, a clerk reminded Judge Hyde that he was scheduled to preside in night court that evening and that his daughter’s case was on the calendar. Judge Hyde testified before the masters that he had forgotten that he was scheduled to preside that evening.
Judge Hyde then called longtime pro tem, John Harding, and asked him to cover the January 23 night court because he had an unspecified conflict. Judge Hyde contacted Mr. Harding because he lived nearby, was well liked and respected by the court clerks and had a reputation for honesty and integrity. Judge Hyde had been acquainted with Mr. Harding since he was a child. He knew Mr. Harding as an adult through their mutual service as directors in the local Rotary Club.
Mr. Harding agreed to handle the January 23 night court calendar. When he saw the Suzanne Hyde case file that night, he realized that the conflict involved a family member of the judge’s, and disclosed to the defendant that he knew Judge Hyde. The defendant waived the conflict, and both parties and Ms. Hyde’s sister testified. Mr. Harding rendered judgment in Ms. Hyde’s favor, but he awarded her less than the full amount of damages she sought.
In January 2001, the assignment of pro terns for small claims calendars was the responsibility of Michelle Sunseri, the secretary to the administrator, Ms. Norcup. Ms. Sunseri kept an organized list of more than 50 pro terns. A certain group of pro terns could be counted on to fill in at the last minute.
Judge Hyde did not ask anyone to find a pro tem for the evening’s calendar. The masters found that there was no reason that court staff could not have obtained a pro tem for that evening. The commission concurs with the masters’ rejection of Judge Hyde’s claim that his call to Mr. Harding was *CJP Supp. 343 not unusual. Ms. Norcup, Ms. Sunseri, Ms. Stewart and Judge Hugh Walker all testified that judges did not help in obtaining pro terns. Mr. Harding testified that other than on January 23, he has never been called directly by a judge to serve as a pro tem.
2. Conclusions of Law
a. Telling Clerk to Keep the Date
Judge Hyde’s prevention of the continuance of his daughter’s small claims case constituted prejudicial misconduct and violated canons 1, 2A, 2B(2) and 3E(1) (a judge shall disqualify himself in any proceeding in which disqualification is required by law).
Judge Hyde acknowledged that he was disqualified by law from any proceeding in which his daughter is a party. Yet he continued to be involved in his daughter’s case by telling the clerk to keep the January 23 date, solely for the admitted reason of his daughter’s convenience. Judge Hyde used the authority of his position to confer a benefit on his daughter.
The masters concluded that Judge Hyde’s intervention constituted prejudicial misconduct rather than willful misconduct because there was evidence that “Judge Hyde would have made efforts to maintain a trial date in order to avoid the inconvenience to a litigant in any case where a conflict existed.” Accordingly, the masters declined to find that Judge Hyde acted in “bad faith.” The commission questions whether a “corrupt purpose” of knowingly benefiting a relative should be ameliorated by a finding that the judge would have extended a similar benefit to any other litigant, but, in this particular case, the commission accedes to the masters’ conclusion that Judge Hyde’s intervention with the clerk constituted only prejudicial misconduct.
b. Picking the Pro Tem
Judge Hyde’s selection of his replacement also constituted prejudicial misconduct and violated canons 1, 2A and 3E(1). By selecting the pro tem who would hear his daughter’s case, Judge Hyde at a minimum created the appearance of using his position to gain an advantage for his daughter. The appearance of attempting to help was exacerbated by the fact that he did not call a randomly selected pro tem, but someone with whom he had a social relationship. Judge Hyde contends that Mr. Harding was one of the most respected pro terns and that any pro tem would have ruled as Mr. Harding did. The commission agrees with the masters that even if these contentions are true, they are irrelevant. As the masters explained, the “issue is not *CJP Supp. 344 whether the judge’s conduct affected the case outcome (which was not alleged), but the propriety of the judge’s involvement in his daughter’s case.”
When reminded of the conflict on the evening calendar, Judge Hyde should have allowed the clerk to select a pro tem. However, the commission agrees with the masters that Judge Hyde did not act in “bad faith” when he immediately called Mr. Harding.
D. Count Four
1. Findings of Fact
On June 14, 2000, Judge Hyde sentenced Eddie Streeter on a charge of misdemeanor injury to a child. The sentence included three years of probation.
A year later, while Judge Hyde was on vacation, a letter from Mr. Streeter to Judge Hyde arrived at the Pleasanton courthouse. In the letter, Mr. Streeter requested that his probation be considered fully satisfied because he and his family were relocating out of state and he had completed the court-ordered program of counseling. Mr. Streeter’s letter also thanked Judge Hyde for getting directly involved in pulling his family together and perhaps saving him and his son from further self-destruction.
In Judge Hyde’s absence, Judge Walker held a hearing on Mr. Streeter’s request. Judge Walker granted his request for early termination of probation and dismissed the action pursuant to Penal Code section 1203.4.
On the minute order of Judge Walker’s ruling, a clerk noted, “Judge Hyde to see the letter.” Judge Hyde testified that when he returned from vacation the letter and court file were on his desk. Judge Hyde wrote Mr. Streeter a letter dated July 5, 2001, which read in part: “There is no problem with you leaving the state. And, not only can you leave, but I am terminating your probation on an early basis, if for no other reason than you have truly earned it. ... I am further enclosing a 1203.4 form for you to sign and submit to the Court. You need not be present at the hearing, but may if you wish. This allows the plea of guilty to be withdrawn and the matter dismissed and thus be off your record for most purposes.”
Judge Hyde did not send a copy of the letter to the district attorney’s office or to the defense attorney. Judge Hyde testified that within a relatively short time he told the prosecutor and the defense attorney that he had sent the letter to Mr. Streeter.
*CJP Supp. 345 The commission accepts the masters finding that Judge Hyde knew that Judge Walker had already terminated Mr. Streeter’s probation when he wrote his July 5 letter to Mr. Streeter. Judge Hyde admitted that the letter was “inarticulately written” and explained that the purpose of the letter was to ensure that Mr. Streeter’s file contained a completed Penal Code section 1203.4 form. In response to Judge Hyde’s letter, Mr. Streeter submitted a written petition under Penal Code section 1203.4. At a hearing on July 11, 2001, Judge Hyde gave Mr. Streeter a copy of the filed section 1203.4 form.[17]
2. Conclusions of Law
Judge Hyde committed improper action in failing to provide the prosecutor or the defense attorney with a copy of his letter to Mr. Streeter and failing to give the prosecutor notice of his letter or an opportunity to respond. Judge Hyde’s action violated canons 1, 2A and 3B(7) (prohibiting certain ex parte communications).
E. Count Five
1. Findings of Fact
In July 2000, Judge Walker sentenced Karissa Keman on a misdemeanor charge of alcohol-related reckless driving (reduced from driving under the influence). Her sentence included three years of court probation.
In June 2001, Ms. Keman filed an application to join the Air Force National Guard to pursue a nursing degree. The enlistment was to be a part-time position requiring attendance every other weekend. Ms. Keman was told that the only factor preventing her enlistment into the military was her probation.
Although Judge Walker had sentenced her, Ms. Keman called Judge Hyde around October 23, 2001, because she knew him. When she identified herself, Judge Hyde knew who she was immediately. She is the daughter of Patrick Keman, an attorney and president of the school board. Judge Hyde had known Mr. Keman and his children for many years. He had worked with Ms. Keman when she was in high school on a community volunteer project serving Thanksgiving dinner.
The masters noted that Ms. Keman’s memory of what was said during the telephone conversation was not totally reliable. However, based on Judge *CJP Supp. 346 Hyde’s admissions and the commonality of their testimony, the masters found that: “Ms. Keman told Judge Hyde she was on probation for driving under the influence of alcohol. She told him she intended to join the military, but she was still on probation. She asked whether probation is ever terminated early so the defendant can get into the service. Judge Hyde told her that ‘we do it all the time.’ Judge Hyde instructed Ms. Keman to go to the clerk’s office and have her case added to the calendar, the usual practice.”
After the telephone conversation, Ms. Keman went to the criminal clerk’s window and told clerk Beth Duarte that she had had a “personal conversation” with Judge Hyde and wanted her matter added to the calendar. At that time in the Pleasanton court, defendants could have their matters added to the calendar by asking at the clerk’s window. The clerk’s first choice of department was the judge who last heard the case. Based on Ms. Keman’s comments, Ms. Duarte added her case to Judge Hyde’s calendar even though Judge Walker had last heard the case.
In court, Judge Hyde called the case by saying, “Karissa Marie Keman. What can I do for you?” This gave the impression that Judge Hyde did not know what Ms. Keman wanted, and was therefore misleading. Judge Hyde testified before the masters that he already knew what Ms. Keman wanted when she came into court that day. Nonetheless, Judge Hyde did not disclose to the prosecutor that he had had the ex parte telephone conversation with the defendant. Nor did he disclose his relationship with the defendant and her family.
Ms. Keman told Judge Hyde in court that she needed to have her probation waived to go into the military. Ms. Keman offered no proof that she was enlisting and Judge Hyde did not request any. As a result, it was never revealed that the contemplated military service would only be part time. Judge Hyde asked the prosecutor if he had any objection to Ms. Keman’s request; he did not. Judge Hyde granted Ms. Keman’s request and terminated her probation.[18]
2. Conclusions of Law
Judge Hyde’s failure to disclose his discussion with Ms. Keman and his relationship to her family constituted prejudicial misconduct and violated *CJP Supp. 347 canons 2A and 3E(2).[19] Judge Hyde was aware of the requirements of canon 3E as he received a private admonishment in 1997 for failing to disclose a telephone conversation from a friend of a litigant. Judge Hyde suggested that disclosure was not required because he has “lots of friends” in the small community of Pleasanton. The masters observed, however, that the Supreme Court has noted that even in a small town, an objective observer would view failure to disclose a prior relationship and an ex parte communication as prejudicial to the administration of justice.[20]
F. Count Six
1. Findings of Fact
On Friday, August 24, 2001, Judge Hyde presided over an arraignment calendar. Beau Dempsey appeared for arraignment on a misdemeanor domestic violence charge. Mr. Dempsey, who was in custody, was disruptive in court and made threatening throat-slashing gestures toward his wife, who was in the front row of the audience. Judge Hyde told Mr. Dempsey: “You’re already in deep trouble. Write a report on him. Intimidating a witness. Felony. State Prison. . . . Shut up. . . . [H]is bail just went up to one million dollars. . . . Isolate him. Lock him down and get a new report.... I want him next time in chains.” Mr. Dempsey’s arraignment was continued until Monday, August 27. On August 27, Mr. Dempsey again appeared before Judge Hyde. He was arraigned on the misdemeanor, told of the possible addition of felony charges, and referred to the public defender. Judge Hyde told him: “[Ijf you ever come into this court and make noise like you did the other day, I’m going to hold you in contempt of court. Every time I hear a noise out of you, it will be a consecutive year in jail. You’re looking at a lot of felony state prison time.” The next appearance was set for August 29, and Mr. Dempsey remained in custody.
After the August 27 afternoon arraignment calendar concluded, Judge Hyde had a conversation with Mr. Dempsey’s wife, Dana Wagner, in the courthouse hallway, close to the civil clerk’s window. Ms. Wagner told the judge that she wanted to serve marital dissolution papers on the defendant before he was transported from the courthouse back to the jail, which was located away from the courthouse. Judge Hyde agreed that she should do so. *CJP Supp. 348 The masters made the following findings, which the commission adopts[21]:
“Judge Hyde accompanied Ms. Wagner to the civil clerk’s window and spoke to Ms. Wells on Ms. Wagner’s behalf. Judge Hyde told Ms. Wells that defendant Dempsey was in custody, that the defendant had beaten Ms. Wagner, and that they had been married only briefly. The judge also told Ms. Wells that during the defendant’s earlier arraignment appearance, the defendant had made a motion as if he were going to slit someone’s throat. Judge Hyde imitated the gesture on himself to demonstrate to Ms. Wells what the defendant had done.
“Ms. Wagner had already prepared the marital dissolution papers. The judge told Ms. Wells that Ms. Wagner needed to obtain a fee waiver order for the dissolution papers. He conveyed that the fee waiver process had to happen fast because Ms. Wagner needed to serve the defendant that day, before he was transported back to the jail. Judge Hyde did all the talking while he and Ms. Wagner were at Ms. Wells’ window.
“Ms. Wells gave a fee waiver application form to Ms. Wagner. Ms. Wagner and the judge walked to a table in the center of the hallway, in view of and immediately opposite the clerk’s window where Ms. Wells was sitting. The judge remained at the table talking with Ms. Wagner for five or ten minutes while she was filling out the form. As they stood at the table, Ms. Wagner’s side was to Ms. Wells and Judge Hyde was facing Ms. Wells; although Ms. Wells could not hear them from behind her window, she could see their mouths moving as they talked.
“Either the judge or Ms. Wagner gave the completed fee waiver application back to Ms. Wells. She immediately stamped the completed application with the date and time, which was August 27, 2001, at 3:37 p.m. It and the dissolution papers (which at the time were not stamped until filed, either with the fee or a waiver order) were quickly routed to Commissioner Foland, who heard family law matters.
“Less than an hour later, Judge Hyde went to Commissioner Foland’s chambers to check on the status of the fee waiver application. Judge Hyde asked the commissioner if he had reviewed Ms. Wagner’s application yet. The judge explained that he was asking because Ms. Wagner was trying to get her in-custody husband served, and the jail van was waiting to transport the defendants from court. Commissioner Foland pulled Ms. Wagner’s application out of a basket containing other applications, reviewed it and signed it. Judge Hyde said that he would return it to the clerk himself, so that Ms. Wagner could get the dissolution papers filed and served.
*CJP Supp. 349 “Judge Hyde then carried the signed fee waiver order and accompanying dissolution paperwork back to Ms. Wells and handed it to her. Ms. Wells filed and time-stamped the dissolution papers at 4:23 p.m. She filed and timestamped the signed fee waiver order at 4:28 p.m., which was only fifty-one minutes after the application was filed. This was an unusually fast turnaround time, and was due to Judge Hyde’s intervention. Ms. Wells explained that it normally takes 24 hours (and can take up to 48 hours) for the family law commissioner to sign a fee waiver order and return it, and that the clerks’ practice is to advise litigants to call the court in a day or two to see if their paperwork is ready.”
Judge Hyde and Ms. Wagner then advised the judge’s deputy of the situation and the deputy took the dissolution papers to serve them on Mr. Dempsey. Mr. Dempsey was served at 4:40 p.m., while he was still at the courthouse.
2. Conclusions of Law
Judge Hyde’s conduct constitutes prejudicial misconduct. He improperly acted as Ms. Wagner’s advocate and violated the basic tenets of canons 1, 2A, 2B(1), 2B(2) and 3B(7). Judge Hyde’s conversation with Ms. Wagner concerned much more than ministerial matters such as giving her directions; he became embroiled in the matter. His conduct lessens public esteem for the judiciary and underscores the need for the judiciary to remain impartial. The commission agrees with the masters that Judge Hyde “became angry with the defendant” and that: “[A]n objective observer would conclude that his evident desire to help Ms. Wagner was motivated at least in part by that anger. It is also exacerbated by the fact that Judge Hyde did not recognize that he was embroiled, as he apparently still intended to preside over Mr. Dempsey’s case as of August 29 . . . .”
The masters recognized that there can be some degree of informality when dealing with the public in a smaller courthouse such as Pleasanton. They noted, however, that Judge Hyde is an experienced judge, and that he had received an advisory letter in 1998 for assisting a propria persona (pro per) litigant. The masters chastised Judge Hyde for not recognizing “the impropriety of acting as an advocate for someone who was a victim/witness in a case over which he was presiding,” and for attempting to justify his action “on the basis that [Ms. Wagner] was somehow morally or rightfully deserving of his assistance.”[22]
*CJP Supp. 350 G. Count Seven
1. Findings of Fact
On November 14, 2001, Judge Hyde presided over the arraignment of Christopher Piute on felony drug charges. Codefendant Nicole Araiza, who was scheduled for arraignment on the same charges at a later date, was present in the audience. When the case was called, Mr. Piute’s attorney mentioned that Ms. Araiza was in the courtroom and she was called forward. Judge Hyde read the charges filed against her, increased her bail from $60,000 to $350,000, referred her to the public defender’s office, and remanded her into custody. Deputy Public Defender Ray Keller then became Ms. Araiza’s attorney.
The next day, Ms. Araiza filed a peremptory challenge requesting that Judge Hyde be disqualified. Mr. Keller appeared briefly in court. Judge Hyde acknowledged his disqualification and sent the Araiza case up to Judge Walker. Judge Hyde made the decision himself that Judge Walker would be his successor judge. Judge Hyde and Judge Walker are longtime friends.
While still on the bench after sending the Araiza case to Judge Walker, Judge Hyde telephoned Judge Walker, who was on the bench in his own courtroom. In the phone conversation, Judge Hyde explained his reasons for increasing Ms. Araiza’s bail (the substantial quantity of methamphetamine involved, approximately 300 grams, and that a loaded firearm was found in association with the drugs) and asked Judge Walker to “back me up” on his bail increase.
Judge Hyde denied any memory of the exact words, but testified that if Judge Walker recalled the words “back me up,” then he must have said so. Judge Hyde admitted that backing him up was the concept of his telephone call. He added, “I had raised the bail, I was concerned, and I wanted it kept that way, and I was upset for being challenged.”
Mr. Keller took his file on Araiza upstairs to Judge Walker’s courtroom. Mr. Keller saw that Judge Walker was on the telephone and correctly suspected that Judge Hyde had called about the Araiza case. Mr. Keller confronted Judge Walker, who acknowledged that it was Judge Hyde on the telephone and offered to recuse himself from the Araiza case. Mr. Keller declined Judge Walker’s offer because he believed Judge Walker would “be bending over backwards to be fair” to Ms. Araiza as a result of the improper *CJP Supp. 351 communication. After a hearing, Judge Walker granted Mr. Keller’s motion to reduce Ms. Araiza’s bail back to $60,000. The motion was not opposed by the prosecutor.
Although he did not let Judge Hyde know this during the telephone conversation, Judge Walker was very upset by Judge Hyde’s call. Later that day, Judge Walker went into Judge Hyde’s chambers and confronted him. Judge Walker told Judge Hyde that his telephone call was something that “you just don’t do” and that it had “put him [Judge Walker] in jeopardy.” Judge Hyde was apologetic and said that it would not happen again. The masters found that Judge Walker initiated the apology and “rejected as self-serving” Judge Hyde’s claim that he initiated the apology. The next day, Judge Hyde called Mr. Keller into chambers and apologized to him for having called Judge Walker.[23]
At the hearing before the masters, Judge Hyde claimed for the first time that on November 15, 2001, he was under stress from a particularly difficult court session and that he was “woozy” from Indocin, an anti-inflammatory medication he took for gout. The masters noted that Judge Hyde provided no specific case or event in court that morning that caused him stress and that Mr. Keller did not recall the calendar being busier or more stressful than usual. Judge Hyde provided no corroboration that the medication affected his behavior and he did not mention “wooziness” to either Judge Walker or Mr. Keller when he apologized to them. The commission, as did the masters, “decline[s] to find that Judge Hyde was suffering stress or experiencing the side effects of medication that had any bearing on the conduct at issue.”
2. Conclusions of Law
Judge Hyde committed willful misconduct. Judge Hyde’s conduct was unjudicial because it violated canons 1, 2A, 2B(2) and 3B(7), constituted embroilment and was an improper reaction to being disqualified. Judge Hyde clearly acted in a judicial capacity. While still on the bench after being disqualified, Judge Hyde had his clerk telephone Judge Walker, and continued to preside over cases until his clerk was able to get Judge Walker on the phone. When Judge Hyde talked to Judge Walker on the phone, it was “kind of at sidebar,” with court still in session and with attorneys and litigants *CJP Supp. 352 present. Judge Hyde acted in bad faith because his purpose was not the faithful discharge of his judicial duties. A disqualified judge cannot have a proper judicial purpose in initiating an ex parte substantive discussion with his successor judge. A second independent basis for finding bad faith is that Judge Hyde knew he was acting beyond his lawful authority. Judge Hyde, although claiming that he did not “think of it” at the time, admitted in his testimony before the masters that he “knew” at the time that he was acting without authority.
PRIOR DISCIPLINE
Judge Hyde’s present misconduct must be evaluated against the background of his prior discipline.[24] Judge Hyde has previously received three advisory letters, a private admonishment and a severe public censure.
A. The October 27, 1992 Advisory Letter
The second paragraph of this two-paragraph letter states that in closing the matter with a confidential advisory letter: “[T]he commission expressed its agreement with your evaluation that a reference to yourself as the ‘vacuum cleaner for the court’ was clearly inappropriate. The commission also expressed its concern about the appearance of possible bias created by inquiring at the beginning of a proceeding which party has refused to stipulate to a pro tem judge.”
B. The April 25, 1996 Advisory Letter
The letter addressed four distinct types of misconduct. The first section recited that between January 1991 and December 1995, Judge Hyde “personally participated in the solicitation of funds or in-kind donations from persons other than judges on behalf of charitable organizations and used or permitted the use of the prestige of judicial office for fund-raising.” The letter noted that before selling raffle tickets in December 1995, “the presiding judge of [Judge Hyde’s] court told [Judge Hyde] orally and in writing that he believed participation in the fund-raising event as described would violate the Code of Judicial Conduct,” but that Judge Hyde nonetheless participated in the fund-raising event.
The second section indicated that around April 5, 1995, Judge Hyde “told a female visitor to the court, T can get you a job,’ took her to lunch and gave *CJP Supp. 353 her a rose from the rose garden [he] cultivate^] on court property.” The letter goes on to state that Judge Hyde later told a reporter from the local newspaper that his “comment about getting the woman a job ‘was just an off-hand remark made in an effort to be friendly. I certainly never followed it up, nor did I intend to.’ ”
The third section noted that over the years, Judge Hyde “used nicknames for female employees that are or appeared to be demeaning or have sexual connotations, and which were offensive either to those who were the subject of such nicknames or to others who heard them. Examples of such nicknames are ‘Boom Boom,’ ‘Breath,’ ‘Chubbs,’ ‘Legs,’ and ‘Mousemeat.’ ”
The fourth section noted the appearance of embroilment arising out of comments Judge Hyde made to a defendant involved with drugs. The letter recited the following comment by Judge Hyde:
“This is a dope dealer. He keeps coming back. He’s scum in our society. He doesn’t belong here. I want him in state prison. I want him out of here as fast as he can go. . . .
“Reid, I don’t like it, but I’ll tell you what, you show up in this court with anything, if I hear about a PV, I’m personally going to call Judge Goodman up and plead with him to give you the maximum time in state prison. . . .
“I hate dope dealers. You want to screw up your own life and blow your brains out, fine. Leave the rest of the people out there alone.”
C. The May 1996 Public Censure
This severe public censure concluded proceedings that commenced with a seven-count notice of formal proceedings “all generally concerning misuse of the judicial office.” Prior to filing an answer, Judge Hyde submitted a proposed disposition with a stipulated statement of facts. Based on that submission, the commission made findings of fact, including the following:
(1) “In the fall of 1990, Judge Hyde asked certain court employees to access DMV records for the purpose of obtaining the addresses of former classmates in connection with a class reunion.”
(2) “Between 1991 and 1995, Judge Hyde asked various court employees to access DMV records for the purpose of obtaining information regarding motorists that was not related to court business.”
(3) “In 1991, 1993 and 1994, a court secretary performed typing, photocopying, and other services in connection with a paralegal class which Judge *CJP Supp. 354 Hyde taught at a local college. This included typing a lengthy lesson plan, typing mid-term and final examinations, photocopying class materials, mailing out graded final examinations using court envelopes and postage, and typing correspondence.”
(4) “On January 14, 1991, Judge Hyde requested that the court secretary type an ‘affidavit in lieu of appearance’ that he submitted in connection with a complaint regarding a neighbor’s dog, which he filed in his personal capacity.”
(5) “In 1992, Judge Hyde requested that the court secretary type up his application for a federal judgeship. Judge Hyde then had a discussion with the clerk/administrator regarding the best way to get the application to San Francisco on short notice, and the application was ultimately driven to San Francisco by a court attendant utilizing a county vehicle.”
(6) “In 1993 and 1994 there were occasions when Judge Hyde brought his elementary school-aged daughter to work and the court secretary and other court employees assisted in watching her activities. On one occasion in 1993, during her break, a court employee picked up Judge Hyde’s daughter from a dental appointment during what would be considered work hours.”
(7) “Between 1990 and 1995, the court secretary performed work for Judge Hyde that benefited a particular club, an organization of which Judge Hyde was a member and past president.”
(8) “During 1991 and 1992, Judge Hyde requested that the court secretary create a 94-page mailing list for a particular charity; whereupon she also generated copies of a fund-raising letter addressed to those on the mailing list. Additionally, she typed labels, envelopes, by-laws, and personnel policies relating to the charity. The court secretary spent the equivalent of approximately 24 work days on such tasks.”
(9) “In November 1991, Judge Hyde and a clerk/administrator had a conversation regarding utilization of the court secretary’s time, during which the clerk/administrator formed the impression that Judge Hyde was attempting to intimidate him regarding his job security.”
(10) “Between 1991 and 1995, Judge Hyde made sexually related comments toward female court employees which were deemed to be offensive by some court employees who overheard the statements. For example, during the week of October 23, 1995, Presiding Judge Hugh Walker and two division chiefs were having a conversation regarding court policies and procedures when Judge Hyde commented to a female division chief, ‘Are we having a PMS day?’ ”
*CJP Supp. 355 The commission noted that none of the judge’s misconduct concerned “the manner in which Judge Hyde conducted his courtroom proceedings or deported himself while on the bench.” The commission further noted that in a signed separate statement, Judge Hyde represented that he was “aware of the inappropriateness of the actions reflected by the Agreed Statement of Facts and assure[d] the Commission that these actions will not be repeated in the future.” The commission concluded that in view of Judge Hyde’s response to the notice and his assurances that the challenged conduct has ceased and will not resume, “discipline less than removal from office would be appropriate.” The commission therefore accepted “the proposed disposition and agree[d] that it will not order that Judge Hyde be removed from office.”
D. The June 25, 1997 Private Admonishment[25]
The private admonishment concerned Judge Hyde’s action in People v. Pamela Keane. In December 1995, Ms. Keane pled guilty to driving under the influence of alcohol and was sentenced by Judge Walker to probation on the condition that she serve two days in jail through the sheriff’s weekend work program. Ms. Keane served one day in the weekend work program and, on February 29, 1996, Judge Hyde issued an order revoking Ms. Keane’s probation for her failure to comply with the weekend work program condition. On March 14, 1996, Ms. Keane appeared before Judge Walker and admitted to the probation violation. Judge Walker ordered Ms. Keane’s probation revoked and reinstated on the same terms and conditions, with the exception of increasing her jail sentence to five days.
The notice of intended private admonishment then states the following facts:
“On May 6, 1996 [Judge Hyde] received a telephone call from Robert Rossi concerning the Keane case. Rossi is a close friend of [Judge Hyde’s] and is also Keane’s employer. Rossi told [Judge Hyde] of concerns he had regarding Keane’s case and he asked for [Judge Hyde’s] advice regarding what she should do. [Judge Hyde] told Rossi to tell Keane to prepare a letter setting forth the details of the incident that led to her probation violation and to appear in [Judge Hyde’s] court the next day with the letter.
“On May 7, 1996, Keane appeared in [Judge Hyde’s] courtroom and her case was added to that day’s calendar. [Judge Hyde] called the Keane case later that day, but [Judge Hyde] did not disqualify [himself] or disclose [his] communication with Rossi of the previous day. Keane appeared in propria *CJP Supp. 356 persona and submitted the letter that Rossi told her [Judge Hyde] had said to prepare. Keane also explained why she had not completed the initial two-day jail sentence and admitted violating her probation. [Judge Hyde] revoked and reinstated Keane’s probation on the same terms and conditions, with the exception of modifying the jail sentence imposed by Judge Walker on March 14, 1996 by reducing it from five days to one.”
The commission unanimously found that Judge Hyde’s failure to disqualify himself or to disclose his discussion with Mr. Rossi violated canon 3E (disqualification) and gave rise to an appearance of impropriety in violation of canon 2A. The commission also found that the discussion with Mr. Rossi was an improper ex parte communication in violation of canon 3B(7).
E. The February 4, 1998 Advisory Letter
This advisory letter expressed disapproval of Judge Hyde’s “involvement in a pro per defendant’s case including [Judge Hyde’s] reading an inmate’s letter addressed to [him] at the courthouse regarding her receipt of a complaint and summons in an unlawful detainer case, [Judge Hyde’s] direction to the clerk’s office to send her an ‘answer packet’ so she could respond to the unlawful detainer complaint and summons and [Judge Hyde’s] direction to a clerk to prepare a fee waiver order, which [Judge Hyde] signed.” The commission noted that the “inmate/defendant was given additional time in which to respond, without notice to the other side.”
The commission viewed Judge Hyde’s actions “as providing legal and judicial assistance not available to other pro per litigants,” and cited canons 2B (use of the prestige of judicial office) and 3B(7) (as regards ex parte communications).
LACK OF CANDOR IN FILINGS WITH THE COMMISSION
The Rules of the Commission on Judicial Performance spell out the requirements that a judge be forthright and cooperate with the commission. Rule 104 is entitled “Duty to Cooperate; Response by Respondent Judge.” Subdivision (a) requires that a judge “shall cooperate with the commission” and provides that a “judge’s cooperation or lack of cooperation may be considered by the commission in determining the appropriate disciplinary sanction or disposition.”[26] Rule 119 requires that a judge’s answer to a notice *CJP Supp. 357 of formal proceedings be “as complete and straightforward as the information reasonably available to the respondent judge permits.”[27] In addition, rule 106 provides that written communications by a respondent judge’s attorney “shall be deemed to be the written communications of the judge.” The rule further provides that the signing of any document or statement “warrants that the signer has personal knowledge of the matter contained in the document or statement or has investigated the matter and has a good faith belief in the accuracy of the representations contained in the document.”[28]
Although Judge Hyde should have been well acquainted with the commission’s rules and procedures, his filings in this discipline proceeding have not complied with the spirit or letter of the commission’s rules.
A. Count One
Before the masters, Judge Hyde testified that when he arrived at the court, he went to his chambers, probably spent some time in his chambers, and then on his way to his courtroom went through the clerk’s office and approached Ms. Silva. This differed from his response to the commission’s preliminary *CJP Supp. 358 investigation letter as well as his verified answers[29] which read: “[I]mmediately upon arriving at the courthouse, Judge Hyde walked to the clerk’s office and reported the incident to a clerk in the traffic department.”
Also, Judge Hyde’s verified answer “specifically denie[d] the allegation in Count One that he ‘asked a traffic clerk to obtain information from the Department of Motor Vehicles (DMV) regarding the identity of a driver that [Judge Hyde] said had cut [him] off.’ ” However, Judge Hyde testified before the masters: “I just said, Nise, will you run this guy’s record? He cut me off. I think that’s all I told her. I didn’t have time to go into a big explanation.”
B. Count Two
Before the masters, Judge Hyde admitted that to be entertaining he initiated the story about the sex act during his conversation with Mr. Sims in the break room. In his answer, Judge Hyde had asserted that “at a holiday party at the end of the day in the courthouse lunchroom . . . several strange and wild incidents regarding the old Livermore courthouse were being told.” The answer goes on to state: “One of the true stories that was discussed by several of the individuals attending the party was that a certain unnamed court administrator was caught once with another individual in a male-male act of fellatio in the parking lot of the old courthouse. Judge Hyde confirmed that the story was not just a rumor floating around about the old courthouse, but was a true story. It was related that one judge wanted to fire the individual while another judge did not. Ultimately the individual was not fired. The story was just one of many that day that was being recounted. The story was not told in a malicious fashion nor was it meant to be offensive and at the time it did not appear that anyone was offended.”
During the hearing before the masters, trial counsel asked Judge Hyde about this answer and he admitted that the answer was incorrect, that he told the story, and that he used the term “blow job.”
C. Count Three
In his answer, Judge Hyde stated that he intended to call a pro tern for the January 23 small clams night court when he first learned in early January that he was scheduled to preside at that session, “but he became busy and forgot about the matter, totally.” Before the masters, Judge Hyde testified that he had intended to trade the calendar with some other judge and it was only on the afternoon of January 23—when his oversight was brought to his attention— that he decided to seek a pro tern to cover the calendar.
*CJP Supp. 359 D. Count Five
In his verified answer to count five, Judge Hyde wrote: “Judge Hyde has never had a business or professional relationship of any kind with Ms. Keman. Judge Hyde does not recall ever meeting Ms. Keman prior to the incident.”
Before the masters, Judge Hyde testified that when he received a phone call from Ms. Keman, he immediately knew who she was. He stated that she was the daughter of the school board president and that he had known Mr. Keman and his kids for years.
When the denial of knowledge in his answer was brought to his attention, Judge Hyde stated: “I didn’t see that. That’s not correct. I mean, I have known Karissa for a long time. I’ve known all the Keman kids for a long time. Not real well, but they know me, and I know them.”
E. Count Six
In his response to the preliminary investigation letter, Judge Hyde stated that he “did recognize that he became upset with Mr. Dempsey’s conduct during the proceedings.” Judge Hyde continued that he “appreciated that this could potentially affect his impartiality at the next hearing,” and accordingly, he “recused himself from the case prior to the hearing.” Judge Hyde’s verified answer denied the allegation in the notice of formal proceedings that he became angry with Mr. Dempsey. Before the masters, Judge Hyde testified that his answer to the preliminary investigation letter was wrong. “It’s an instance where I explained the situation to my lawyer and wrote it down wrong and I didn’t catch that.”
F. Count Seven
On October 17, 2002, the first amended notice of formal proceedings included count seven and alleged that on November 15, 2001, Judge Hyde telephoned Judge Walker and asked him to back him up on the bail increase. Judge Hyde’s verified answer was filed on November 4, 2002, less than a year following the incident, and states: “However, after being disqualified, Judge Hyde has no recollection of making any statement to Judge Walker that Judge Walker should back him up on the case as alleged in the First Amended Notice of Formal Proceedings.”
At the hearing before the masters, Judge Hyde admitted to making the statement, but claimed that he did not recall the incident until several months *CJP Supp. 360 after he had filed his answer, when the defense attorney, Mr. Keller, mentioned that the commission had called him.[30]
THE MASTERS’ COMMENTS ON JUDGE HYDE’S CREDIBILITY
The lack of candor indicated by Judge Hyde’s filings is consistent with the masters’ observations about the judge’s testimony before them. The commission, following the Supreme Court’s guidance, gives considerable weight to the masters’ comments on credibility.[31]
A. Count One
The masters found Judge Hyde’s “various explanations” to be “less than uniform.” They noted the differences between representations made in Judge Hyde’s letters and answers and his testimony, and concluded that the “conflicting responses to the Commission’s inquiry, and to questions at the hearing, cast doubt upon Judge Hyde’s professed motive to simply protect the public.”
B. Count Two
The masters found that Judge Hyde was not credible with regard to the specifics of this allegation, “in light of his prior inconsistent statements *CJP Supp. 361 denying it.” They rejected “Judge Hyde’s assertion that he was sitting ‘fairly close to’ or ‘right next to’ Mr. Sims at the break room table when the story was told, and the implication that he intended his comments only to be heard by Mr. Sims and not by anyone else.”
C. Count Three
As previously noted, the masters rejected Judge Hyde’s testimony that it was Ms. Mateo who initiated the conversation with him. They commented that Judge Hyde “has given completely inconsistent and irreconcilable accounts of his intentions between January 9, when he realized the conflict, and January 23, when he called Mr. Harding.”[32] The masters also rejected Judge Hyde’s “claim that his call to Mr. Harding was not unusual, and that he has been asked to secure the services of a pro tem many times in the past.”
D. Count Four
The masters noted that Judge Hyde’s “testimony as to this matter” was credible.
E. Count Six
The masters were very critical of Judge Hyde’s testimony on this count. They characterized his testimony regarding his contact with Ms. Wells as “both inconsistent and vague.”[33] The masters noted that, although Judge *CJP Supp. 362 Hyde testified that “he did not recall any further contact with Ms. Wagner after returning the signed paperwork to Ms. Wells, other than to wish her luck,” “according to the judge’s response, the judge and Ms. Wagner advised the judge’s deputy of the situation, and the deputy then took the dissolution papers and had the defendant served, which we find to be true.” The masters also rejected Judge Hyde’s testimony that he did not become angry with Mr. Dempsey.[34]
F. Count Seven
The masters are very skeptical of Judge Hyde’s claim that he did not remember his telephone conversation with Judge Walker.[35] They “find that Judge Walker initiated the apology, and reject as self-serving Judge Hyde’s claim that he initiated it.” They also question Judge Hyde’s motivation for *CJP Supp. 363 apologizing to Mr. Keller.[36] The masters decline to accept Judge Hyde’s claim that the drug he was taking for gout had some bearing on his conduct. Finally, the masters suggest that Judge Hyde’s conduct in Araiza reflects the lack of objectivity toward a drug defendant for which Judge Hyde received an advisory letter in 1996.
DISCIPLINE
Once the commission has determined that the allegations of misconduct have been demonstrated by clear and convincing evidence, the commission must determine the appropriate discipline. The Supreme Court has held that the purpose of a disciplinary proceeding “is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.”[37]
The Supreme Court has recognized that in determining the appropriate discipline, each case must be considered on its own facts.[38] Nonetheless, the commission looks to opinions of the Supreme Court and its own prior decisions for guidance in exercising its responsibility to determine the appropriate discipline in a particular case.
The commission has identified five factors that are particularly relevant to its determination of discipline in this matter: (1) the number of acts of misconduct; (2) the effect of prior discipline on the judge’s conduct; (3) concerns regarding the judge’s integrity; (4) whether the judge is likely to continue to engage in unethical conduct; and (5) the impact of this matter on the judicial system.
In addition, the commission considers the mitigating evidence offered by the judge.
*CJP Supp. 364 (1) The Number of Acts of Misconduct
The Supreme Court has noted that the number of wrongful acts is relevant to determining whether they were isolated occurrences or part of a course of conduct that reflects a lack of temperament and ability to perform judicial functions in an evenhanded manner.[39]
In this proceeding, the commission finds that Judge Hyde engaged in two acts of willful misconduct, four instances of conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and one instance of improper action. This misconduct took place over a 15-month period between September 2000 and the middle of November 2001. Furthermore, these acts of misconduct follow five prior disciplines for over 20 other acts of misconduct.
(2) Prior Discipline
The Supreme Court has often looked at whether a judge has received prior discipline and the effect of such discipline in determining the appropriate discipline for wrongful conduct. In one case, the Supreme Court removed a judge for willful and prejudicial misconduct, but noted that it “would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction.”[40] The Supreme Court nonetheless removed Judge Doan, noting:
“Lastly, Doan did not learn from her public reproval in 1990 for lending the prestige of her office to advance the private interest of others. She again lent the prestige of her office to advance the private interest of others, even though she had promised not to do so in connection with the 1990 public reproval, in the matters relating to Darlene’s nephew Darren Powell in 1992, Meneses in 1993, and Darlene herself in 1993.
“In sum, Doan has had three opportunities for reformation. She will have no more.”[41]
*CJP Supp. 365 Judge Hyde has received three advisory letters, a private admonishment and a severe public censure. Moreover, most of his present misconduct is repetitious of, or similar to, wrongful acts for which he was disciplined.
The first three counts concern wrongful acts that were previously addressed in Judge Hyde’s 1996 censure. The censure found that on numerous occasions Judge Hyde accessed “DMV records for the purpose of obtaining information regarding motorists that was not related to court business.” Nonetheless, Judge Hyde subsequently asked a clerk to access DMV records of a person who cut him off in traffic. The censure also criticized Judge Hyde for making sexually related comments. In November 2000, Judge Hyde repeated the offense by reciting, on his own volition, an inappropriate sexual story in front of the new court administrator (whom he had not previously met) and clerk’s office employees. In addition, the 1996 censure found that Judge Hyde had requested that a secretary prepare a document that he then filed in a personal lawsuit and had brought his daughter to the court causing court staff to assist in watching over her. This discipline, however, did not sensitize Judge Hyde to the impropriety of intervening in his daughter’s small claims case and then personally selecting the pro tern to hear her case.
In June 1997, Judge Hyde was admonished for failing to disqualify himself from a case in which he had received an ex parte telephone call from a friend and for failing to disclose the phone call. Three years later, Judge Hyde talked to Ms. Keman on the telephone about terminating her probation, but again failed to disqualify himself from subsequently presiding over her case and failed to disclose the telephone call.
In February 1998, Judge Hyde received an advisory letter for providing a pro per litigant with legal and judicial advice. In August 2001, he again became embroiled in a pro per litigant’s case, assisting Ms. Wagner with filing her papers and then making sure that the commissioner immediately considered her request.
Judge Hyde’s April 1996 advisory letter noted that his comments to a criminal defendant who was involved with dmgs were not patient, dignified or courteous. The advisory letter also stated that the comments, which included threatening to call another judge, gave the appearance of embroilment. In 2001, Judge Hyde again became angry with a criminal defendant involved with dmgs and this time he called another judge, despite having been disqualified from the matter.
This repetition of wrongful acts identical to, or similar to, the previously disciplined misconduct indicates that the prior discipline failed to motivate Judge Hyde to study the California Code of Judicial Ethics or to change his *CJP Supp. 366 behavior. This conclusion finds support in Judge Hyde’s testimony before the masters. When asked about his 1996 censure for improperly accessing DMV records, Judge Hyde first tried to distinguish the censure on the grounds that it concerned accessing the names of high school classmates for a reunion. When pressed, Judge Hyde admitted that the censure also covered other incidents of accessing DMV records, but asserted that count one was the only time he had improperly accessed DMV records since the censure. Judge Hyde also admitted that in 1996 he had assured the commission that his offenses would not be repeated and that he had taken measures to ensure that they were not repeated, but before the masters, Judge Hyde could not say whether he had read the code to make sure he knew what he could and could not do. Moreover, during his testimony concerning Ms. Keman, Judge Hyde only remembered his 1997 private admonishment after he had reread it.
(3) Judge Hyde’s Integrity
It is generally accepted that honesty is a minimal qualification that is expected of every judge.[42] In this case, substantial questions concerning Judge Hyde’s integrity are raised by (1) the discrepancies between Judge Hyde’s filings and his testimony, and (2) the masters’ comments concerning Judge Hyde’s credibility. These questions remain despite the commission’s review of the record and its consideration of Judge Hyde’s oral argument.
Judge Hyde’s approach to the final two counts is particularly problematic. Judge Hyde first admitted in his response to the preliminary investigation letter that he became angry with Mr. Dempsey. Then in his verified answer he denied that he had become angry. Before the masters, Judge Hyde testified that when he explained the situation to his lawyer, his lawyer “wrote it down wrong” and Judge Hyde did not catch the mistake. Although this explanation cannot be totally discounted,[43] it seems more likely that Judge Hyde denied becoming angry because (1) his anger would suggest an improper motive for his embroilment with Ms. Wagner’s case, and (2) if he admitted to being angry with Mr. Dempsey, he might have to attempt to explain why he did not immediately recuse himself when Mr. Dempsey next appeared before him.[44]
*CJP Supp. 367 Judge Hyde’s representations concerning his activities on behalf of Ms. Wagner are also troublesome. Without directly denying Ms. Wells’s account, Judge Hyde attempts to minimize the assistance he provided Ms. Wagner. Judge Hyde, nonetheless, admits that he went to Commissioner Poland’s office and inquired as to the status of Ms. Wagner’s request for a fee waiver. Judge Hyde’s admitted visit to Commissioner Poland supports Ms. Wells’s version of Judge Hyde’s involvement. Judge Hyde explains his visit as motivated by his concern that Mr. Dempsey be served before he was transported back to the jail. Judge Hyde, however, told the masters that after Commissioner Poland signed the order, he gave it to the clerk or Ms. Wagner, wished Ms. Wagner good luck, and had no further dealings with her. The masters disagree, finding that Judge Hyde advised his deputy of the situation. They further note that the signed fee waiver order was time-stamped at 4:28 p.m. and Mr. Dempsey was served at 4:40 p.m. It seems unlikely that Mr. Dempsey would have been served so quickly without Judge Hyde’s encouragement, if not participation.
Judge Hyde’s insistence that he did not recall his telephone call to Judge Walker in the Araiza matter strains credulity. As noted by the masters, Judge Hyde at all times had a clear recollection of the facts in the underlying case. He insists, however, that when he filed his verified answer, less than a year after the events, he did not remember his telephone call to Judge Walker from the bench, his confrontation that afternoon with an angry Judge Walker, or his emotional apology to Mr. Keller the next morning. Then, at the hearing before the masters, Judge Hyde, for the first time, suggests that on November 15, 2001, he had a particularly stressful calendar and that he was “woozy” as a result of taking medicine for his gout. Judge Hyde offered no medical evidence to support this claim and Judge Walker and Mr. Keller testified that Judge Hyde had not mentioned that he took medication or that he suffered from any side effects from his medicine.
*CJP Supp. 368 (4) Likelihood of Future Violations
In determining whether a judge is likely to again violate the California Code of Judicial Ethics, the commission reviews a judge’s approach to the current proceedings and other indicia of the judge’s recognition of, and ability to conform to, the standards of judicial conduct. In Fletcher the Supreme Court noted: “[T]he record ‘belies petitioner’s claim that he has learned from past experience and has modified his courtroom behavior. It demonstrates instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case.’ ”[45]
In Kloepfer the Supreme Court noted that the record did not “suggest that petitioner has, or will be able to, overcome” his lack of judicial temperament.[46]
In its decision to remove Judge Platt, the commission concluded that Judge Platt was “unlikely to conform his future conduct to the canons.”[47] Similarly, in its decision to remove Judge Van Voorhis, the commission concluded that it was “close to a certainty” that the judge would continue to violate the California Code of Judicial Ethics if he remained on the bench [48]
Judge Hyde’s repetition of misconduct for which he has been previously disciplined suggests that he cannot, or will not, conform his behavior to the standards of judicial conduct. For example, he argues that his concern for public safety justified his request that a clerk access DMV records on a driver who cut him off in traffic. As has been noted, this defense is not supported by the findings of fact (concerning the timing of his request) and is not legally sound.[49] Thus, a determination that Judge Hyde sincerely believed in this defense would raise concerns that he would always be able to rationalize departures from the standards of judicial conduct.
A similar dilemma is presented by Judge Hyde’s defense to count two. Although he had been previously disciplined for making sexually related *CJP Supp. 369 comments, he claims that he was entitled to tell Mr. Sims about a past incident of an employee engaging in oral sex in a car in the court parking lot because it was a true story. The commission questions whether any judge with 20 years of experience really believes that an otherwise inappropriate recitation of a sexual story is justified solely because the story is true. Accordingly, Judge Hyde either does not really believe in his defense or has questionable judgment, or both.
Judge Hyde’s willingness to ignore the standards of judicial conduct is further demonstrated by his assistance of Ms. Wagner. Although he received an advisory letter in 1998 for providing assistance to a pro per litigant, Judge Hyde justified assisting Ms. Wagner because Mr. Dempsey, her husband, was dangerous.[50] Contrary to the implication of Judge Hyde’s argument, there was no apparent emergency. Judge Hyde knew that Mr. Dempsey was incarcerated and was not due back in court for a couple of days.
Judge Hyde’s actions in Ms. Keman’s case demonstrate his inability or unwillingness to appreciate the underlying principles of the California Code of Judicial Ethics. Despite his 1997 private admonishment, Judge Hyde felt that there was no need to disclose his telephone conversation with Ms. Keman or to recuse himself from the case. He explained to the masters that, although Ms. Keman kept trying to explain her case and ask questions, he kept reiterating that she should go to the clerk’s window. He further stated that disclosure was not required because he knows half the defendants by their first names and it is not “necessary to disclose unless there’s some sort of relationship that the law requires.” Following his admonishment, Judge Hyde should have known that canon 3E(2) states that a trial judge “shall disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no actual basis for disqualification.”
Judge Hyde’s telephone call to Judge Walker in the Araiza matter is the most recent demonstration of his inability to conform to the standards of judicial conduct. Judge Hyde was warned in 1996 about a lack of objectivity with drag defendants and for threatening to call another judge. Furthermore, in November 2001, Judge Hyde had just received a preliminary investigation letter from the commission. Accordingly, Judge Hyde had every reason to scrupulously observe the standards of judicial conduct. Instead, Judge Hyde became angry at being disqualified and called Judge Walker, although he *CJP Supp. 370 knew that this was unethical.[51] Even when the commission’s attention was focused on him, Judge Hyde could not resist repeating an act of misconduct.
(5) Impact of Misconduct on the Judicial System
The effect of the misconduct upon the integrity of and respect for the judiciary is a concern inherent in the Supreme Court’s determination that Judge Fletcher’s removal was “necessary to protect the public and the judiciary’s reputation.”[52] Similarly, when the Supreme Court removed Judge Adams from the bench, it noted that he had “engaged in successive extrajudicial transactions . . . creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate.”[53] The importance the court gave to the impact of the misconduct on the judicial system becomes evident when contrasted with the considerable character evidence in support of Judge Adams[54] and Justice Mosk’s strong dissent.[55]
This is the sixth time that the commission has had to discipline Judge Hyde. He has already received three advisory letters, a private admonishment and a severe public censure. How could the commission meet its mandate to *CJP Supp. 371 enforce rigorous standards of judicial conduct and to maintain public confidence in the integrity of the judicial system if it does not remove Judge Hyde from office when it finds that he has repeated acts of misconduct for which he has been previously censured and admonished?
When it publicly censured Judge Hyde in 1996, the commission noted that none of Judge Hyde’s acts of misconduct concerned “the manner in which Judge Hyde conducted his courtroom proceedings or deported himself while on the bench.” Here, Judge Hyde’s prejudicial conduct concerning Ms. Keman and his willful misconduct in the Araiza matter concern his deportment on the bench.
When it publicly admonished Judge Hyde in 1996, the commission accepted Judge Hyde’s assurances that he was aware of the inappropriateness of his actions and had taken steps to ensure that they would not be repeated. The record before the commission shows that these assurances were hollow. Not only did Judge Hyde repeat some of the very acts of misconduct for which he was disciplined, but it appears that he did not review the California Code of Judicial Ethics to determine what he could and could not do.
In addition, Judge Hyde’s repeated acts of misconduct have a deleterious impact on court staff. The clerks have to handle Judge Hyde’s improper requests for DMV records, accept his interference with the normal procedures for small claims cases, listen to his sexual stories, and facilitate his assistance to litigants. They know that litigants talk to Judge Hyde on the telephone and that he neither discloses the conversations nor disqualifies himself from the cases. The staff knows that these acts of misconduct have continued despite Judge Hyde’s prior discipline.
(6) Mitigating Factors
The Supreme Court has stated that character evidence and evidence of a judge’s contributions to the judicial system do not mitigate or excuse misconduct, but may be considered in determining the appropriate discipline. In Adams, the Supreme Court noted: “The foregoing evidence of petitioner’s qualifications for and contribution to the judicial system, during the course of a lengthy judicial career, does not mitigate or excuse petitioner’s wilful misconduct or prejudicial conduct. (Spruance v. Commission on Judicial Performance [(1975)] 13 Cal.3d 778, 800 [119 Cal.Rptr. 841, 532 P.2d 1209].) We may, however, and do take these factors into account in considering the totality of the circumstances that are pertinent to our determination of *CJP Supp. 372 the appropriate discipline. (See McCartney v. Commission on Judicial Qualifications (1974) 12 Cal.3d 512, 539-540 [116 Cal.Rptr. 260, 526 P.2d 268] ,)”[56]
In Broadman the Supreme Court reiterated that evidence that a judge is industrious and innovative does not mitigate or excuse willful or prejudicial misconduct, and indicated that the commission had properly considered evidence in mitigation in the determination of the appropriate discipline.[57]
Judge Hyde expressed genuine concern for his community and there is evidence that Judge Hyde was an innovative judge. In addition, the commission recognizes that a number of attorneys testified as to Judge Hyde’s contributions to his community, his good character and his good judicial performance. The weight accorded Judge Hyde’s concern for his community as a mitigating factor, however, is lessened by the fact that Judge Hyde’s 1996 advisory letter and his 1996 public censure chastised him for not keeping his community and judicial activities separate.
CONCLUSION
After having received three advisory letters, a private admonishment and a severe public censure, Judge Hyde is again before the commission. This time the commission has determined that Judge Hyde has committed two acts of willful misconduct, four acts of conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and one act of improper action. The commission has further determined that at least four of Judge Hyde’s most recent acts of misconduct were for unethical conduct for which he had been previously disciplined. In addition, Judge Hyde’s lack of candor in his filings with the commission and the masters’ concerns with Judge Hyde’s credibility raise serious questions about his integrity.
The commission has determined that these factors compel the removal of Judge Hyde from office [58] Judge Hyde’s persistence in violating the standards of judicial conduct, his inability or unwillingness to learn from prior discipline, and his general approach to the commission and to this proceeding preclude the commission from having any confidence that he will not continue to violate the California Code of Judicial Ethics if allowed to remain *CJP Supp. 373 on the bench. The commission concludes that, despite Judge Hyde’s contributions to his community and his court, the totality of the circumstances mandates Judge Hyde’s removal for “the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.”[59]
This decision shall constitute the order of removal of Judge D. Ronald Hyde and, pursuant to the provisions of article VI, section 18 of the California Constitution and rule 120(a) of the Rules of the Commission on Judicial Performance, Judge D. Ronald Hyde is hereby disqualified from acting as a judge.
Commission members Judge Rise Jones Pichón, Justice Vance W. Raye, Judge Madeleine I. Flier, Mr. Marshall B. Grossman, Mr. Michael A. Kahn, Mrs. Crystal Lui, Mr. Jose C. Miramontes, Mrs. Penny Perez, Ms. Ramona Ripston, and Ms. Barbara Schraeger voted in favor of all the findings and conclusions expressed herein and the removal of Judge D. Ronald Hyde from judicial office. Commission member Dr. Betty L. Wyman did not participate in this matter.

 The commission's order noted that there had been “no proffer of the proposed ‘further evidence,’ and no showing of why the evidence was not provided to the special masters or why it would have been ‘prejudicial’ to have done so.” At the hearing, when asked by a commission member, Judge Hyde’s counsel was unable to explain why it would have been “prejudicial” to have presented the evidence to the special masters.

 See rules 121 and 123 of the Rules of the Commission on Judicial Performance. The provision in rule 121 allowing the commission to hold the hearing before itself has not been used since 1995.

 Willful misconduct as a matter of law includes the lesser offense of prejudicial misconduct.

 Judge Hyde misinterprets canon 3B(11) when in his brief he argues that he did not violate the canon because there was no evidence that he used nonpublic information for any “personal advantage.” The canon states that a judge shall not use nonpublic information “for any purpose unrelated to judicial duties.”

 Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260].

 Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1092 [77 Cal.Rptr.2d 408, 959 P.2d 715],

 The masters noted: “The penal code is patently irrelevant to the conduct at issue. Judge Hyde cannot seriously contend that he was consciously acting pursuant to the penal code when he accessed the DMV records, nor that the penal code provides a justification for his actions. There was no case pending involving the driver and even if there had been, Judge Hyde would be disqualified from taking any judicial action because he was a percipient witness.”

 This phrase is defined by the Supreme Court in Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at page 172.

 Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 910 [226 Cal.Rptr. 558, 718 P.2d 920],

 In Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at pages 1092-1093, the court explained: “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is *either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity” [citation].’ (Doan v. Commission on Judicial Performance [(1995)] 11 Cal.4th [294,] 312 [45 Cal.Rptr.2d 254, 902 P.2d 272], original italics.)”

 There was testimony that at this time all the employees of the clerk’s office were female.

 Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams).

 Adams, supra, 10 Cal.4th at page 878.

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th 1079, 1104, citing Doan v. Commission on Judicial Performance, supra, 11 Cal.4th 294, 312.

 Canon 3B(4) states that a judge “shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity.” Judge Hyde met with Mr. Sims in his “judicial capacity . . . .” The commission rejects the argument in Judge Hyde’s brief that because canon 3B is entitled “Adjudicative Responsibilities,” canon 3B(4) does not apply when a judge is acting in his or her judicial capacity, but is not exercising an adjudicative responsibility.

 The masters rejected Judge Hyde’s suggestion that the clerk approached him. They explained: “We find no reason to doubt Ms. Mateo’s testimony that it was the judge who approached her. Ms. Mateo discussed the conflict issue with her supervisor before leaving the message for Suzanne Hyde, had no contact with Judge Hyde before leaving the message (even under the judge’s version of the facts), had chosen to leave a message for the litigant, not her father, and had done so only the day before. It would not make sense that Ms. Mateo, an experienced clerk who was promoted to supervisor shortly thereafter, would the next day choose to initiate a conversation with Judge Hyde and ask him what he wanted to do about scheduling, as Judge Hyde claims. On the other hand, it does make sense that the judge would approach Ms. Mateo—a message for his daughter had been left the day before, the judge admits generally that he discussed the status of the case with his daughter, and most significant, he clearly had a definite opinion that the case should not be continued.”

 Judge Hyde’s actions in accepting the written Penal Code section 1203.4 form, holding a hearing, and giving Mr. Streeter a copy of the filed form, belie the argument in Judge Hyde’s brief that he could not violate canon 3B(7) because there was no pending or impending matter.

 The masters noted that a veteran prosecutor testified that he has never agreed to an early termination of probation based on a part-time enlistment. They also commented: “Judge Hyde has attempted to rely on the prosecutor’s non-objection to the termination of probation in order to minimize this charge. However, the decision to grant or deny the defendant’s request was Judge Hyde’s. Moreover, because the prosecutor was totally unaware of the ex parte conversation and the judge’s relationship with the defendant and her family, he was not in an informed position to make an objection.”

 Canon 3E(2) reads: “In all trial court proceedings, a judge shall disclose on the'record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no actual basis for disqualification.”

 Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at page 324.

 The masters’ citations to the record have been omitted.

 The masters comment: “However charitable or kind, or however well Mentioned, Judge Hyde’s conduct ignores his own embroilment with defendant Dempsey. It is not the ‘right thing’ (as the respondent’s attorney argued) for a judge to choose to act as an advocate for a *CJP Supp. 350 litigant, regardless of the circumstances. There was also no urgency as contended by Judge Hyde. When Judge Hyde assisted Ms. Wagner, defendant Dempsey was scheduled to appear again only two days later.”

 The masters commented in a footnote: “It is likely that this apology, which Mr. Keller described as emotional, was made in hopes of avoiding a complaint to the commission by Mr. Keller. At the time, Judge Hyde was under investigation by the commission for other conduct now at issue. He had received the commission’s first letter just three weeks before. . . . With his prior discipline, including the severe public censure, it is very reasonable to assume that Judge Hyde recognized the grave danger that this misconduct posed to his judicial career if the commission learned of it.”

 Rule 125(b) of the Rules of the Commission on Judicial Performance states that any “prior disciplinary action may be received in evidence to prove that conduct is persistent or habitual or to determine what action should be taken regarding discipline.” Judge Hyde’s five prior disciplines were admitted into evidence before the masters.

 The notice of intended private admonishment issued on June 25, 1997. Judge Hyde did not contest the admonishment and, pursuant to rule 114(a) of the Rules of the Commission on Judicial Performance, the admonishment became final 30 days after its issuance.

 Subdivision (a) reads: “A respondent judge shall cooperate with the commission in all proceedings in accordance with Government Code section 68725. The judge’s cooperation or lack of cooperation may be considered by the commission in determining the appropriate *CJP Supp. 357 disciplinary sanction or disposition as well as further proceedings to be taken by the commission but may not be considered in making evidentiary determinations.”

 Subdivision (c) reads: “The answer shall be as complete and straightforward as the information reasonably available to the respondent judge permits. The answer shall (1) admit each allegation which is true, (2) deny each allegation which is untrue, and (3) specify each allegation as to the truth of which the judge lacks sufficient information or knowledge. If a respondent judge gives lack of information or knowledge as a reason for a failure to admit or deny any allegation, the respondent judge shall state in the answer that a reasonable inquiry concerning the matter in the particular allegation has been made, and that the information known or readily obtainable is insufficient to enable the respondent judge to admit or deny the matter.”

 Rule 106 reads:
“A judge may be represented by counsel in all commission proceedings. The written communications of counsel shall be deemed to be the written communications of the judge. Counsel has the authority to bind the judge as to all matters except a stipulation as to discipline.
“Any paper filed with the commission and any written statement made to the commission or to its staff must be signed by the judge or the judge’s counsel. A stipulation as to discipline must be signed by the judge. The signing of any document or statement warrants that the signer has personal knowledge of the matter contained in the document or statement or has investigated the matter and has a good faith belief in the accuracy of the representations contained in the document or statement.
“This mle applies to the filing of responses to staff inquiry letters and preliminary investigation letters under rules 110 and 111, to the filing of answers in formal proceedings under rule 119, and to all other filings with the commission and the masters and all other correspondence with the commission.”

 Judge Hyde’s representations on count one in his verified answers to the notice of formal proceedings and the amended notice of formal proceedings are identical.

 When trial counsel started to question Judge Hyde about calling Judge Walker, Judge Hyde responded:
“Initially, in my response, I said I didn’t remember this at all. You’re going to ask me about that, I presume.
“And the reason is, when my lawyer presented it to me, presented that I went to Judge Walker to talk to him about this case.
“I said, I never went to Judge Walker. I couldn’t remember it.
“Much later than that, after this was progressing, I had an occasion to talk with Mr. Keller, who came to talk to me about some other matters. And he said, I got a call from the Commission, or I’ve talked to them. And I said, about what? And he goes, the phone call.
“And all of a sudden, it was like a slap in the head, I remembered exactly what it was. And I remember the morning was the very high—high-volume, lots of stuff going on, stressful morning. And I remember about that time, and at that time, I was taking the gout medicine, which causes me sometimes to be a little woozy. That doesn’t excuse what happened.
“I don’t recall the total colloquy between Mr. Keller and I with regard to the raising of bail. But because of the amount of dope and the weapons involved, I was—when I was challenged, I did something that I don’t do. I got angry. I was ticked, because this was a real danger to the community, I felt.”

 Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1304 [240 Cal.Rptr. 859, 743 P.2d 919] (“We do, however, give special weight to the factual determinations by the masters, who are best able to evaluate the truthfulness of witnesses appearing before them.”); see also Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 914 [81 Cal.Rptr.2d 58, 968 P.2d 958]; Gubler v. Commission on Judicial Performance (1984) 37 Cal.3d 27 [207 Cal.Rptr. 171, 688 P.2d 551]; Wenger v. Commission on Judicial Performance (1981) 29 Cal.3d 615, 623 [175 Cal.Rptr. 420, 630 P.2d 954],

 The masters explain: “He has moved from: (1) implying that he always intended that the case be heard by a pro tem, stating that he called one himself because he heard from a clerk at the last minute that the clerk had not located one and because it was not unusual for judges to call pro terns (Response, exh. 2, p. 2); to (2) explicitly stating that it was his intention on January 9 to ‘call for a pro tem but he forgot about the matter, totally,’ until reminded by one of the clerks on the afternoon of January 23 (Answer pp. 3-7); to, finally, (3) admitting that no clerk ever tried to contact a pro tem, claiming that he believed he was trading calendars with Judge Walker, and claiming that he never contemplated even the idea of a pro tem until the moment on January 23 when the clerk reminded him of the case (Hyde RT 87:20-99:24).”

 The masters wrote:
“We see no reason to doubt Ms. Wells’ rather detailed recollection of events leading up to the point where Judge Hyde admittedly handed her the signed waiver form. This was the first and only time that a judge ever approached Ms. Wells’ window with a litigant, or asked for a form on behalf of a litigant. (Wells RT 485:7-24.) For the judge to speak with a clerk on Ms. Wagner’s behalf is entirely consistent with his admitted willingness to speak with another judicial officer, Commissioner Poland, on her behalf.
“Moreover, in his response to the first preliminary investigation letter and his answer, the judge never directly addresses the allegation that he accompanied Ms. Wagner to the window and spoke to a clerk on her behalf regarding a fee waiver. (Virtually all of the details of that conversation—including mention of the fee waiver—were set forth in the investigation letter, which is dated only two months after the events in question.) In the response, Judge Hyde states without explanation that he ‘merely assisted Ms. Dempsey in obtaining the forms she *CJP Supp. 362 requested to file her dissolution.’ He does not specifically deny the details contained in the investigation letter. (Exh. 1, p. 5, Exh. 2, p. 9, emphasis added.) The Answer states only that he denies asking for an expedited fee waiver. (Answer, p. 15.)
“That denial in the Answer not only contradicts the very detailed testimony of Ms. Wells, but also is inconsistent with the gist of the judge’s testimony at the hearing. Judge Hyde believed that time was of the essence, and acted accordingly in order to help Ms. Wagner. For example, he testified that he was unaware of the normal turnaround time, but that it would not have mattered under the circumstances because this was an ‘abnormal situation.’ (Hyde RT 128:9-14.)
“Judge Hyde’s testimony at the hearing regarding his contact with Ms. Wells was both inconsistent and vague, including the potential that Mrs. Dempsey did not yet have a fee waiver application at the time of her hallway encounter with the judge. [Fn. omitted.]
“In sum, to reject Ms. Wells’ detailed testimony (which included a visual memory of the judge imitating the throat slashing gesture) would require us to conclude that it was fabricated. No reason was offered to support such a conclusion. [Fn. omitted.]”

 The masters wrote:
“The August 24 and August 27 transcripts indicate otherwise. Moreover, Judge Hyde in response to the first preliminary investigation letter stated that he ‘did recognize that he became upset with Mr. Dempsey’s conduct during the proceedings,’ ‘appreciated that this could potentially affect his impartiality,’ and ‘for that reason recused himself.’
“The judge disavowed his response at the hearing and claimed that he recused himself on August 29 solely because of his status as a potential witness. Whether or not anger was the reason for the judge’s recusal, he later told Ms. Norcup that he had become angry with the defendant when he made the throat slashing gesture, and we so find.”

 The masters comment in a footnote:
“Up until the hearing, Judge Hyde had claimed in his response to investigation (Exh. 6), his verified answer, and his prehearing brief, that he had no memory of the alleged telephone conversation with Judge Walker. He concludes each document by stating, ‘Judge Hyde has no recollection of making any statement to Judge Walker that Judge Walker should back him up on the case as alleged. . . .’ There is no mention of any conversation with Judge Walker about the case.
“Judge Hyde exhibited a detailed memory of the Araiza case in his response letter and his answer in an effort to show that his increase in bail was warranted. Yet he alleges that he had forgotten calling Judge Walker about it. It is difficult to reconcile Judge Hyde’s excellent recall about the bail enhancement with his memory lapse about the phone call by an angry Judge *CJP Supp. 363 Walker and his emotional apology to Mr. Keller about the whole incident (discussed below). We hasten to add that Judge Hyde had been under investigation by the commission at the time all of this occurred.”

 In a footnote, the masters state: “It is likely that this apology, which Mr. Keller described as emotional, was made in hopes of avoiding a complaint to the commission by Mr. Keller. At the time, Judge Hyde was under investigation by the commission for other conduct now at issue. He had received the commission’s first letter just three weeks before. (Exh. 1.) With his prior discipline, including the severe public censure, it is very reasonable to assume that Judge Hyde recognized the grave danger that this misconduct posed to his judicial career if the commission learned of it.”

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112, citing Adams, supra, 10 Cal.4th at page 912.

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112, citing Furey v. Commission on Judicial Performance, supra, 43 Cal.3d at page 1318.

 Fletcher v. Commission on Judicial Performance, supra, 19 Cal.4th at page 918.

 Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at page 339; see also Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297 [267 Cal.Rptr. 293, 787 P.2d 591]. The Supreme Court declined to remove Judge Kennick from office because of misconduct noting that “it seems likely that our public censure of each of petitioner’s misdeeds would have led him to correct and improve his judicial behavior.” (Kennick, at p. 341.) The court did remove the judge from office for his persistent failure or inability to perform judicial duties.

 Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at page 340.

 Fletcher v. Commission on Judicial Performance, supra, 19 Cal.4th 865, 919, footnote 24; Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239].

 In his argument before the commission, Judge Hyde stated that he had not read the briefs his attorneys had submitted on his behalf.

 Trial counsel did ask Judge Hyde why he recused himself, and Judge Hyde testified:
“Very honestly, when he came on for counsel and plea with the Public Defender, I called the case, and said, what’s your plea. And Mr. Ulfelder says, I don’t think you can hear this, Judge.
*CJP Supp. 367 “I’m like, why? I mean, I just didn’t think it through, and a busy morning. He said, you’re a percipient witness. I said, you’re right, I am. I saw him make the slashing throat thing across his throat to her.
“So I recused myself. And I had no idea what happened to that case. I didn’t touch it again.” Trial counsel then asked Judge Hyde if he recused himself in part because he had become upset with Mr. Dempsey and Judge Hyde responded:
“No. I mean, when you’re used to dealing with criminal people and they act out, you get upset, and sometimes they get removed. And I think, that’s what happened to him.
“I don’t get upset very often, but sometimes you get upset. But that’s no reason to recuse yourself, unless I really have some strong personal feelings against him, which I didn’t at that time. Other than observing him, because I knew—I wouldn’t keep the case. It would probably go upstairs for a preliminary hearing.”

 Fletcher v. Commission on Judicial Performance, supra, 19 Cal.4th 865, 920-921, quoting Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d at page 866.

 Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d at page 866.

 Inquiry Concerning Platt (2002) No. 162, Decision and Order Removing Judge Platt from Office, page 19 [48 Cal.4th CJP Supp. 227, 253],

 Inquiry Concerning Van Voorhis (2003) No. 165, Decision and Order Removing Judge Van Voorhis from Office, page 44 [48 Cal.4th CJP Supp. 257, 308].

 Moreover, the defense conveniently overlooks that the 1996 public censure states: “Judge Hyde represents (and the Commission accepts as true) that he has taken measures to ensure that neither court personnel nor county equipment is utilized in any manner or in any activity that is not strictly court-related.”

 Judge Hyde testified that he volunteered to help Ms. Wagner because “This was a young man that could kill someone. His anger was such. And I was concerned about her. And she had already taken a pretty good beating from this guy, and so she wanted to get him served.”

 Before the masters, trial counsel (Mr. Coyle) and Judge Hyde engaged in the following exchange:
“Q: When you apologized to Judge Walker, as you testified, and to Mr. Keller, weren’t you worried that the Commission on Judicial Performance would find out about this incident where you had called Judge Walker on this case?
“A: No. That did not cross my mind. It crossed my mind that I had done something that I shouldn’t have done in a fit of anger.
“Q: Well, you recognized it to be unethical, didn’t you, what you had done?
“A: I didn’t put it in those terms. I just knew it was improper.
“Q: What impropriety did you recognize?
“A: Once you’re challenged from a case, you shouldn’t be talking to another judge.
“Q: You did not recognize that as an ethical issue?
“A: At the moment, I acted in anger. In the afternoon, I knew it was wrong, and the next morning with Mr. Keller, and I admitted it to both of them.”

 Fletcher v. Commission on Judicial Performance, supra, 19 Cal.4th at pages 921 and 918.

 Adams, supra, 10 Cal.4th at page 914.

 The court noted: “Several judges and numerous attorneys testified to their perception of petitioner’s outstanding legal and administrative skills, noting his significant contributions toward streamlining the court system and implementing a ‘fast-track’ system.” (Adams, supra, 10 Cal.4th at p. 911.)

 Justice Mosk wrote: “All that the majority can say in support of removal is that, in their view, Judge Adams’s ‘extrajudicial transactions’ have ‘creat[ed] an appearance of serious impropriety’ and have ‘thereby tend[ed] to diminish the public esteem of the judiciary . . . .’ (Maj. opn., ante, at p. 914.) In so many words, they announce that he must be removed because of certain of his acts and omissions off the bench, even though he has in fact properly performed his judicial functions during his long tenure and, as the record shows, has actually increased his community’s confidence in its judges. No reasonable person could agree. I surely cannot.” (Adams, supra, 10 Cal.4th at p. 919 (dis. opn. of Mosk, J.).)

 Adams, supra, 10 Cal.4th at pages 911-912.

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112.

 This discipline is based on the commission’s findings and conclusions on counts one, two, three, five, six and seven. Although the commission finds that the conduct alleged in count four constituted improper action, the discipline would be the same even if count four were dismissed.

 Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at pages 1111-1112, citing Adams, supra, 10 Cal.4th 866, 912.